UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
STEPHANIE MURRAY,                          :
                                           :
                      Plaintiff,           :
                                           :               **OPINION AND ORDER**
         -against-                         :               10-cv-05523 (DLI)
                                           :
MICHAEL J. ASTRUE,                         :
COMMISSIONER OF SOCIAL SECURITY,           :
                                           :
                      Defendant.           :
-------------------------------------------------------- x
**DORA L. IRIZARRY, U.S. District Judge:**

Plaintiff Stephanie K. Murray filed applications for supplemental security income and

disability insurance benefits under the Social Security Act (the "Act") on November 6, 2007 and

August 22, 2008, respectively, alleging a disability that began on January 31, 2007. Plaintiff's

application was denied, and on reconsideration, Plaintiff appeared *pro se* and testified at a

hearing held before Administrative Law Judge Hazel C. Strauss ("ALJ") on October 27, 2009.

By a decision dated March 8, 2010, the ALJ concluded that Plaintiff was not disabled within the

meaning of the Act. On October 7, 2010, the ALJ's decision became the Commissioner's final

decision when the Appeals Council denied Plaintiff's request for review.

Plaintiff filed the instant appeal seeking judicial review of the denial of benefits, pursuant

to 42 U.S.C. § 405(g). The Commissioner moved for judgment on the pleadings, pursuant to

Fed. R. Civ. P. 12(c), seeking affirmation of the denial of benefits. (*See* Comm'r Mot. for J. on

the Pleadings, Dkt. Entry 11.) Plaintiff cross-moved for judgment on the pleadings, seeking

reversal of the Commissioner's decision and remand. Plaintiff contends that the ALJ: (i) failed

to weigh the medical opinions of record and develop the record properly; (ii) failed to evaluate

Plaintiff's credibility properly; and (iii) relied upon flawed vocational expert testimony. (*See* Pl. Mot. for J. on the Pleadings, Dkt. Entry 13.)

For the reasons set forth more fully below, the Commissioner's motion is denied, Plaintiff's motion is granted, and the matter is remanded for further administrative proceedings consistent with this opinion.

## BACKGROUND

### A.     Non-medical and Testimonial Evidence

On October 27, 2009, Plaintiff, appearing *pro se*, testified at a hearing concerning her disability claim. (R. 32-72.)[1]   Born on November 23, 1969, Plaintiff worked as an Assistant Manager at an Exxon Mobil gas station, but stopped working in January 2007 due to a ruptured hernia and depression. (*Id.* 36, 41-42.)  Plaintiff testified that she could no longer work due to multiple sclerosis ("MS"), and also suffered from depression, memory loss, and pain and numbness in her feet, back, hands, fingers, neck and left leg. (*Id.* 49, 67, 69.)  She also reported difficulties with walking, sitting, lying down, and sleeping, noting that she paces when she cannot sleep. (*Id.* 49, 53-54.)

Plaintiff further reported that she had been experiencing seizures, but they ceased while she was on Avonex, which was prescribed to slow down the symptoms of MS. (*Id.* 53-54.)  A visiting nurse and social worker came to Plaintiff's home during August and September 2009 to teach her how to self-administer the Avonex injections, and to help her deal emotionally with the MS diagnosis. (*Id.* at 52-53.)  Plaintiff testified that she continues to experience seizure symptoms such as tremors, dizziness, and poor balance, and that she was prescribed use of a cane in October 2009 to help with her balance and ease back pain. (*Id.* 53, 62.)

---

[1] "R." citations are to the correspondingly numbered pages in the certified administrative record, which was filed as entry 16 on the docket.

Plaintiff further testified that she currently sees a psychiatrist at the New Horizon Counseling Center, but prior to the diagnosis of her MS in 2008, she had been attending weekly counseling sessions since 2002 at the St. John's Episcopal Community Mental Health Center. (*Id.* 55-56.) She also testified that she had been seeing neurologist Dr. David Steiner for MS since her diagnosis in December 2008, but she has not seen him, nor has she seen any other neurologist, since July 16, 2009, because she is awaiting a Medicaid card. (*Id.* 82.) Plaintiff also testified that her current general practitioner is Dr. Detweiler at South Shore Family Medical Associates. (*Id.* 50-51.)

Plaintiff and her two daughters lived with Plaintiff's mother in 2007 and 2008, during which time Plaintiff did some simple food preparation, changed her baby's diapers, prepared her bottles, and lifted the toddler up when she weighed around seventeen pounds. (*Id.* 61, 71.) Plaintiff currently lives in her own apartment, and her twenty-two year-old daughter does the meal preparation and cleaning, and accompanies Plaintiff to the grocery store when Plaintiff goes food shopping. (*Id.* 64-65.) Plaintiff noted that she feeds and dresses herself, and cares for her own personal needs and grooming, but she is afraid to shower because of her lack of balance. (*Id.* 62, 66.) She noted that she has slipped in the bathroom when getting out of the bathtub, and that she lacks coordination. (*Id.* 62-63.) Plaintiff testified that on a typical day, she interacts with her three year-old daughter and sometimes takes her to the park up the block from their apartment with her older daughter's help. (*Id.* 54.) She also testified that she watches television and travels by car service to visit her mother. (*Id.* 65.) Plaintiff stated that she stopped driving in 2008 when she lost her vision in her left eye, and, although her vision has returned, she no longer drives because she does not own a vehicle. (*Id.* 40-41.)

Plaintiff reported an inability to walk for more than a half a block without stopping due to lack of balance and coordination, as well as back and leg pain. (*Id.* 67-69.) She also stated that she could not stand for more than one or two minutes without leaning on something, or sit for longer than thirty to forty minutes without standing up due to back pain and stiffness and tingling in her legs. (*Id.*) Plaintiff also reported tingling and numbness in her fingers resulting in difficulties with reaching overhead and grasping small items in her fingers. (*Id.* 69-70.) She reported an inability to lift more than five or six pounds, and stated that simply holding a gallon of milk is difficult. (*Id.* 71.)

Plaintiff currently takes medication for MS, seizures, joint pain, depression, and constipation, and takes vitamin B12. (*Id.* 51-54, 58-59). She also performs daily exercises to improve her balance and mobility. (*Id.* 53.)

**B.      Medical Evidence**

**1.          Medical Evidence Prior to Alleged Onset Date of January 31, 2007**

On April 28, 2003, Plaintiff's laboratory results at St. John's Episcopal Hospital revealed that she had low blood levels of Dilantin (indicative of a seizure disorder). (*Id.* 421.) Notes from an October 2005 Ultrasound Report indicated that Plaintiff was diagnosed with a seizure disorder in 1998 and was prescribed Dilantin. (*Id.* 434.) After the alleged onset date, on June 29, 2007, Plaintiff indicated to an intake worker at St. John's Episcopal Hospital Community Mental Health Center that she has a long history of major depression since 2000, but has no history of psychiatric hospitalization. (*Id.* 363, 365.)

**2.          Medical Evidence on or after Alleged Onset Date of January 31, 2007**

Plaintiff stopped working as an Assistant Manager at an Exxon-Mobile gas station on January 31, 2007 due to a ruptured hernia and depression. (*Id.* 41.) On March 14, 2007, an MRI

of Plaintiff's pelvis revealed a midline hernia. (*Id.* 431.) Several months later, on June 29, 2007, Plaintiff began seeking psychiatric treatment at St. John's Episcopal Hospital Community Mental Health Center. (*Id.* 285-303.) Plaintiff reported a long history of major depression since 2000, and had been treated at the clinic in 2002-2003. (*Id.* 285, 331.) In 2006, after losing her job, Plaintiff moved into her mother's home with her two children, ages 20 and 1.5 years old. (*Id.* 217.) Plaintiff's initial mental status exam at Community Mental Health Center revealed that Plaintiff's mood was tense, depressed, fearful, angry, and anxious. (*Id.* 296.) Plaintiff reported physical limitations including a hernia, sleeping problems, and low energy levels. (*Id.* 290, 298.) Upon psychiatric evaluation of Plaintiff, Dr. Vladimir Glauberson observed that Plaintiff's mood was somewhat depressed, and her affect labile. (*Id.* 215.) Both Dr. Glauberson and the social worker assessed a GAF of 59,[2] and diagnosed Plaintiff with depressive disorder-NOS (not otherwise specified) and borderline personality disorder. (*Id.* 215, 298.) Dr. Glauberson noted that Plaintiff requires psychotherapy and medication in order to remain stable. (*Id.* 298.) Shortly thereafter, Plaintiff's primary care physician, Dr. Charlie Chen, at the Joseph P. Addabbo Family Health Center, prescribed Dilantin for Plaintiff's seizures and Lexapro for her depression. (*Id.* 261.)

On July 13, 2007, Plaintiff visited Arbor WeCare for a biopsychosocial evaluation with Dr. Reddy. (*Id.* 223-229.) Plaintiff stated that she was diagnosed with depression and was receiving mental health treatment. (*Id.* 224.) She stated that her depression had been gradually worsening for three years, is precipitated and aggravated by stress, and is alleviated by medication. (*Id.* 226.) She also reported a ten-year history of mild seizure disorder, which is

---

[2] According to the *Diagnostic and Statistical Manual of Mental Disorders,* 4th ed., a GAF of 59 is indicative only of moderate symptoms or difficulty in social occupational or school functioning.

aggravated by stress and alleviated by medication, and she had a three-month history of a hernia. (*Id*.) Dr. Reddy noted that Plaintiff has physical and mental health problems that significantly affect her functioning, but she has no psychiatric limitations on her ability to work, and only minor physical limitations consisting of seizure precautions (no driving, climbing heights, lifting, pulling, pushing). (*Id.* 227-29.) Dr. Hillel Glover subsequently conducted a consultative psychiatric evaluation for depression, noting that Plaintiff was occasionally tearful and depressed. (*Id.* 230-238.) He diagnosed Plaintiff as having an adjustment disorder, depression disorder, and a GAF of 70-75,[3] and recommended a low dose of medication and brief counseling to address Plaintiff's stressors, but noted that there are no psychiatric limitations to Plaintiff's employment. (*Id.* 238.)

From July 30, 2007 through February 2008, Plaintiff attended weekly therapy sessions with social worker Corinne Eisner, and monthly psychopharmacology appointments with Dr. Glauberson at Community Mental Health Center. (*Id.* 304-10, 379-83, 464-74.) An early progress note from August 2, 2007 indicated that Plaintiff's thoughts were disorganized and her speech was pressured during a session in which she articulated concerns about her health, the cost of a potential hernia operation, and getting a job. (*Id.* 306.) After a hernia repair operation in August 2007, a St. John's surgical progress note confirmed that Plaintiff had no pain, and Dr. Glauberson noted that Plaintiff had improved sleep, and was taking care of her eighteen month-old baby. (*Id.* 307, 500.) During October sessions with Dr. Glauberson and Ms. Eisner, Plaintiff admitted to taking her medications only sporadically, and, throughout November, her mood was anxious. (*Id.* 308-09.) The following month, Plaintiff told Ms. Eisner that she is not mentally fit

---

[3] According to the *Diagnostic and Statistical Manual of Mental Disorders*, 4th ed., a GAF of 70-75 indicates that, if symptoms are present, they are transient and expectable reactions to psychosocial stressors, and no more than slight impairment in social, occupational, or school functioning.

to work, and in December, Dr. Glauberson noted that Plaintiff was experiencing mood fluctuations, and had stopped taking her depression medication. (*Id.* 309-10.)

On January 1, 2008, Plaintiff was referred to Dr. David Guttman by the Division of Disability Determination for a consultative internal medicine examination, and to Dr. Richard Mays for a consultative psychiatric evaluation. (*Id.* 311-17.) Upon examination, Dr. Guttman found that Plaintiff had no physical limitations, and recommended that Plaintiff should not operate motor vehicles or moving machinery because of her seizure disorder. (*Id.* 312-13.)

Plaintiff's psychiatric evaluation with Dr. Mays revealed symptoms of anxiety, diminished sense of pleasure and self-esteem, social withdrawal, excessive worry and short term-memory deficits. (*Id.* 315.) Dr. Mays opined that Plaintiff could follow and understand simple instructions, perform simple tasks independently, and maintain a regular schedule, but had some difficulty with attention and concentration, was somewhat impaired in her ability to learn new tasks, had a moderate-to-high level of difficulty relating with others, was experiencing a high level of stress, and would have moderate difficulty performing complex tasks independently and making appropriate decisions. (*Id.* 317.) Dr. Mays diagnosed a moderate depressive disorder with psychotic features and a panic disorder without agoraphobia, and ultimately assessed that Plaintiff's psychiatric problems were not significant enough to interfere with her ability to function on a daily basis. (*Id.*)

On January 7, 2008, Plaintiff experienced a seizure. (*Id.* 501.) Dr. Glauberson noted that Plaintiff's condition was stable when put back on Dilantin, but three weeks later, he recommended that Plaintiff be excused from her work for a month pending further evaluation. (*Id.* 385, 501.) On March 7, 2008, Ms. Eisner and Dr. Glauberson together completed a medical questionnaire concerning Plaintiff's conditions for the Division of Disability Determinations.

(*Id.* 322-28.) Ms. Eisner reported that, as a result of outside stressors, Plaintiff continued to experience symptoms of depression, and that she recently experienced seizures. (*Id.* 322.) A mental status examination revealed that Plaintiff's mood was depressed and anxious. (*Id.* 325.) A functional assessment revealed that Plaintiff's anxiety interfered with her ability to accomplish tasks. (*Id.* 326-27.) Ms. Eisner indicated that she was unable to provide an opinion regarding whether Plaintiff was able to perform work related activities or function and respond appropriately in a work related setting. (*Id.* 326-28.) Dr. Glauberson noted that since 2006, Plaintiff's prognosis has depended on multiple outside factors, but did not specify the duration and prognosis of her conditions. (*Id.* 323.)

On April 17, 2008, Dr. J. Kessel, a State psychiatric consultant, determined that, although Plaintiff's depressive symptoms and anxiety impairments did not meet the criteria in the Listing of Impairments for a major depressive disorder, Plaintiff has a depressive disorder-NOS and an anxiety disorder-NOS. (*Id.* 341, 344, 346.) He noted that Plaintiff had mild restrictions in performing the activities of daily living and maintaining concentration, and moderate difficulties with maintaining social functioning. (*Id.* 351.)

MRIs of Plaintiff's brain ordered by Dr. Glauberson in May, July, and December 2008, revealed a demyelinating disease consistent with the finding of MS, and a May 7, 2008 electroencephalogram ("EEG")[4] revealed normal results. (*Id.* 362, 647-51.)

In May 2008, Dr. Glauberson reported that Plaintiff had poor compliance with her medication regimen, and Plaintiff subsequently experienced two mild seizures and reported feeling off balance. (*Id.* 464, 503.) The following week, Plaintiff complained to Dr. Glauberson of headaches and sleep apnea, and he noted that Plaintiff had an irritable mood and affect. (*Id.*

---

[4] An EEG is a test that measures and records the electrical activity of the brain.

464.)  Throughout June, Plaintiff complained to Drs. Glauberson and Chen of physical ailments including slurred speech, blurred vision, recurring seizures and tingling in her foot.  (*Id.* 157, 505, 536-37.)  Dr. Chen scheduled an MRI and made a referral to a neurologist at St. John's Hospital, but conducted no diagnostic tests.  (*Id.*)

In notes dated August 7 and 21, 2008, Dr. Chen reported that Plaintiff had an uncontrolled seizure disorder and that Plaintiff "cannot work at this point since she needs to see her neurologists" to adjust her seizure-control medication, and that she must see a psychiatrist for further evaluation and treatment of her uncontrolled depression.  (*Id.* 511-12, 540.) A progress note from Plaintiff's August 25, 2008 appointment with Dr. Glauberson indicates that additional tests were to be conducted regarding Plaintiff's seizures, and in September and October, Plaintiff experienced additional seizures.  (*Id.* 568-69, 749-58, 765.)  St. John's Hospital neurology progress notes indicated that Plaintiff's Dilantin levels were sub-therapeutic, and that Plaintiff complained of dizziness and paresthesias in her legs.  (*Id.* 568-69, 749-52.)

On December 8, 2008, Plaintiff admitted herself to the New Horizon Counseling Center for psychiatric evaluation related to her depression and anxiety.  (*Id.* 552-54.)  The intake summary prepared by social worker Sharon Bryan reveals that precipitating factors for Plaintiff's mental state include her living situation, medical problems, and poor compliance with her medication.  (*Id.* 552.)  The report also indicates that Plaintiff previously was treated for depression at the Community Health Center with therapy and medication with positive outcomes.  (*Id.* 553.)  On December 17, 2008, Dr. Marie Lippman, a psychiatrist at New Horizon, conducted a psychiatric examination of Plaintiff.  (*Id.* 556-57.)  Dr. Lippman assessed a moderate recurrent major depressive disorder on Axis I and a GAF score of 50, and recommended medications and weekly individual therapy.  (*Id.* 557.)

From December 17, 2008 through July 16, 2009, Plaintiff was treated by neurologist Dr. David Steiner for epilepsy and for her newly-diagnosed MS. (*Id.* 578-657, 689-94, 698, 700.) On December 17, 2008, Dr. Steiner conducted an initial consultation with Plaintiff, during which Plaintiff complained of headaches, seizures, and worsening symptoms of numbness, tingling and weakness in her arms, legs and feet. (*Id.* 578-81.) Dr. Steiner found that Plaintiff had intact vision, decreased perfusion pressure, normal coordination, and that Plaintiff could ambulate independently, although she stumbles at times. (*Id.* 580.) Dr. Steiner prescribed medications for numbness and sleep difficulties, and recommended that Plaintiff undergo additional brain MRIs and begin a home exercise program. (*Id.*)

A December 22, 2008 lumbar spine MRI at Dr. Steiner's direction indicated mild anterior spondylosis at L2-3, L3-4 and L4-5 and no disc herniation. (*Id.* 560, 651.) A January 7, 2009 Brainstem Auditory Evoked Response test and EEG test both revealed normal results, and Dr. Steiner recommended clinical correlation. (*Id.* 642, 645-46.) On January 14, 2009, Plaintiff underwent Somatosensory Evoked Potential testing of her upper extremities, which also returned normal results, and Dr. Steiner recommended ongoing physical therapy. (*Id.* 643-44.) During January 28 and 30, 2009 appointments with Dr. Steiner, Plaintiff was alert, conversational, and displayed normal judgment. (*Id.* 582-89.) Plaintiff complained to Dr. Steiner of blurred vision three to four times a week, continuing weakness and numbness, and she feels as if she needs to stretch to eliminate the numbness. (*Id.* 583, 587.) Dr. Steiner diagnosed MS, polyneuropathy, and monomeuritis, which explained Plaintiff's lower back pain, numbing, and tingling. (*Id.* 588.) Spinal MRIs conducted on February 9, 2009 indicated disc degeneration at C5-6 (consistent with findings of spondylosis) and mid to lower thoracic disc degeneration and

bulging discs at the cervical and thoracic spinal regions.  (*Id.* 652.)  There was no spinal cord or nerve root impairment, nor were any disc herniation or compression fractures found.  (*Id.*)

In a letter dated February 9, 2009, Dr. Steiner's physician assistant, Ms. Rampersad, reported that Plaintiff will be starting medication for MS, which may produce serious side effects.  (*Id.* 698.)  She also stated that Plaintiff "may be limited by her condition on levels of cognitive function, fatigue/weakness, gross motor impairment, heat sensitivity, or visual/speech limitations."  (*Id.*)  From March 10, 2009 through April 28, 2009, Ms. Rampersad administered weekly Avonex injections to treat Plaintiff's MS and, subsequently, Plaintiff was provided Avonex to self-administer.  (*Id.* 636-637.)  In April and May 2009, Plaintiff noted improvement in her vision and a decrease in the frequency of weakness episodes, though she continued to complain of fatigue, tiredness, appetite loss, and depression.  (*Id.* 637.)

On June 29, 2009, Ms. Bryan and Dr. Lippman completed a Psychiatric/Psychological Impairment questionnaire, which indicated that Plaintiff had been diagnosed with major depressive disorder-recurring and moderate, with primary symptoms of depression and anxiety. (*Id.* 679-86.)  Additionally, Plaintiff was mildly limited in several areas of basic functioning, and moderately limited in her ability to sustain an ordinary independent routine, work in coordination with others, maintain socially appropriate behavior, and set realistic goals.  (*Id.* 682-84.) Plaintiff was markedly limited in her ability to remember locations and work-like procedures, understand, remember and carry out detailed instructions, maintain attention for extended periods, perform activities within a schedule, maintain regular attendance and punctuality, complete a normal work week without interruptions from psychologically-based symptoms, interact appropriately with the general public, accept instructions and criticisms from supervisors, or respond appropriately to changes in the work setting.  (*Id.*)  Dr. Lippman and Ms.

Bryan opined that Plaintiff is likely to be absent from work more than three times a month as a result of her impairments, and that Plaintiff could tolerate low levels of work stress. (*Id.* 685-86.)

On July 16, 2009, Plaintiff expressed concerns about her Avonex therapy, and presented complaints of mood swings, irritability, sleep difficulties, appetite loss, photosensitivity, and pain in her limbs. (*Id.* 637-38.) A physical examination revealed that Plaintiff had good judgment, was alert and oriented and could ambulate independently, but stumbles at times. (*Id.* 639.) Ms. Rampersad assessed that Plaintiff's neurological condition showed worsening depression and anxiety. (*Id.* 640.) On October 14, 2009, Plaintiff visited Dr. Detweiler, her primary care physician, who noted the exacerbation of her MS. (*Id.* 658.)

## C. Testimony from Vocational Expert

Victor Alberigi, a vocational expert ("VE"), testified via telephone at Plaintiff's hearing. (*Id.* 72-86.) In determining whether there were any positions in the local and national economies that Plaintiff could perform, the ALJ asked the VE about two hypothetical claimants with differing residual functional capacity ("RFC") assessments, both of whom had the same background as the Plaintiff (39 years old, completed high school, and whose past relevant work included jobs as a cashier, assistant manager and manager of a retail store, and camp counselor). (*Id.* 77.) The first claimant, based on the reported restrictions by Drs. Mays and Kessel, could follow and understand simple instructions, perform simple tasks independently, and maintain a regular schedule. (*Id.*) Because of her moderate-to-high level of difficulty relating to others, the claimant cannot perform teamwork. (*Id.*) However, she can handle a job where she performs tasks alone. (*Id.*) The work should also be low stress, simple repetitive work, because the claimant experiences problems with high levels of stress. (*Id.*) The claimant is able to

concentrate for extended periods of time, relate adequately with coworkers and supervisors, and adapt to changes in her environment. (*Id.* 78.) Because of a seizure disorder, she should avoid unprotected heights, moving machinery, and heavy machinery. (*Id.*) The claimant is also physically tired and obese, so she could only "perform work at the light exertional level, lifting/carrying 20 pounds occasionally, ten frequently, can sit six out of eight [hours] and stand and walk six out of eight [hours]." (*Id.* 79.) The VE testified that an individual with these restrictions would be unable to perform any of Plaintiff's past relevant work, but could find work in the local and national economies as a light cleaner, a street cleaner, or a small products assembler. (*Id.* 79-81.)

The second hypothetical claimant had the same psychological impairments, but had more limited physical abilities based on Plaintiff's testimony. (*Id.* 83-84.) She could only walk one-half block at a time, stand for a minute or two at a time and walk and stand for a total of two out of eight hours. (*Id.*) She could only sit one hour at a time, sit for a total of about six out of eight hours, lift five to six pounds, and could lift weight equivalent to a gallon of milk, but must put it down after a few seconds. (*Id.*) The VE testified that with these restrictions, none of her past relevant work could be performed, and from the technical perspective of the DOT, no jobs at all could be performed, because "the DOT requires at least occasional lifting up to ten pounds for a sedentary job." (*Id.* 84.) However, the VE testified that unskilled sedentary jobs that, in practice, do not require lifting more than five or six pounds do exist. (*Id.*) Such jobs include a charge account clerk, an order clerk in the food and beverage industry, and a document preparer, all of which a hypothetical claimant with these restrictions could perform and are available in the local and national economies. (*Id.* 85.)

# DISCUSSION

## I.     Standard of Review

Unsuccessful claimants for disability benefits under the Act may bring an action in federal district court seeking judicial review of the Commissioner's denial of their benefits "within sixty days after the mailing . . . of notice of such decision or within such further time as the Commissioner of Social Security may allow."   42 U.S.C. § 405(g).   A district court, reviewing the final determination of the Commissioner, must determine whether the correct legal standards were applied and whether substantial evidence supports the decision.   *See Schaal v. Apfel,* 134 F. 3d 496, 504 (2d Cir.1998).   The former determination requires the court to ask whether "the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act."   *Echevarria v. Sec'y of Health & Human Servs.,* 685 F. 2d 751, 755 (2d Cir. 1982) (internal citations omitted).   The latter determination requires the court to ask whether the decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."   *Richardson v. Perales,* 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229 (1938)).

The district court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."   42 U.S.C. § 405(g).   A remand by the court for further proceedings is appropriate when "the Commissioner has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the . . . regulations." *Manago v. Barnhart,* 321 F. Supp. 2d 559, 568 (E.D.N.Y. 2004).   A remand to the Commissioner is also appropriate "[w]here there are gaps in the administrative record."   *Rosa v. Callahan,* 168 F. 3d 72, 83 (2d Cir. 1999) (quoting *Sobolewski v. Apfel,* 985 F. Supp. 300, 314

(E.D.N.Y. 1997)). ALJs, unlike judges, have a duty to "affirmatively develop the record in light of the essentially non-adversarial nature of the benefits proceedings." *Tejada v. Apfel,* 167 F. 3d 770, 774 (2d Cir. 1999).

## II.    Disability Claims

To receive disability benefits, claimants must be disabled within the meaning of the Act. *See* 42 U.S.C. §§ 423(a), (d). Claimants establish disability status by demonstrating an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant bears the initial burden of proof on disability status and is required to demonstrate disability status by presenting medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, as well as any other evidence the Commissioner may require. 42 U.S.C. § 423(d)(5)(A); *see also Carroll v. Sec'y of Health & Human Servs.*, 705 F. 2d 638, 642 (2d Cir. 1983).

ALJs must adhere to a five-step inquiry to determine whether a claimant is disabled under the Social Security Act as set forth in 20 C.F.R. §§ 404.1520 and 416.920. If at any step the ALJ finds that the claimant is either disabled or not disabled, the inquiry ends there. First, the claimant is not disabled if he or she is working and performing "substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the ALJ considers whether the claimant has a "severe impairment," without reference to age, education or work experience. Impairments are "severe" when they significantly limit a claimant's physical or mental ability to conduct basic work activities. 20 C.F.R. §§ 404.1520(c), 416.920(c). Third, the ALJ will find the claimant disabled if his or her impairment meets or equals an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant does not have a listed impairment, the ALJ makes a finding about the claimant's RFC in steps four and five. 20 C.F.R. §§ 404.1520(e), 416.920(e). In the fourth step, the claimant is not disabled if he or she is able to perform past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). Finally, in the fifth step, the ALJ determines whether the claimant could adjust to other work existing in the national economy, considering factors such as age, education, and work experience. If so, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 416.920(g). At this fifth step, the burden shifts to the Commissioner to demonstrate that the claimant could perform other work. *See Draegert v. Barnhart*, 311 F. 3d 468, 472 (2d Cir. 2002) (citing *Carroll,* 705 F. 2d at 642).

## III. The ALJ's Decision

On March 8, 2010, the ALJ issued her decision denying Plaintiff's claim. (R. 12-23.) At the first step, the ALJ found that Plaintiff had not worked since her alleged onset date, January 31, 2007. (*Id.* 14.) At the second step, the ALJ concluded that Plaintiff suffered from the following severe impairments: MS, obesity, major depressive disorder recurrent with psychotic features, and panic disorder without agoraphobia. (*Id.*) As a part of the second step, the ALJ gave consideration, as directed by SSR 02-01p, to Plaintiff's obesity, which is noted numerous times throughout the record, despite not being listed by Plaintiff as a disabling impairment. (*Id.*) The ALJ did not consider Plaintiff's seizure disorder to be severe because it is controlled by medication as long as Plaintiff is compliant with her medication regimen. (*Id.*) At the third step, the ALJ concluded that these impairments in combination or individually, did not meet, or equal, a listed impairment in 20 C.F.R. § 404, Subpart P, Appendix 1. (*Id.* 15.) At step four, the ALJ determined that Plaintiff retained the RFC to perform light work with certain limitations, and that Plaintiff's impairments prevent her from being able to perform her past relevant work as a gas

station assistant manager or manager, or a camp counselor.  (*Id.* 18, 21-22.)  At the fifth step, the ALJ concluded that based on the Plaintiff's age, education, work experience, and RFC, Plaintiff could work as a night cleaner, street cleaner, or small products assembler.  (*Id.* 22-23.)

## IV.    Application

Plaintiff moved for judgment on the pleadings, contending that the ALJ: (i) failed to weigh the medical opinions of record and develop the record properly; (ii) failed to evaluate Plaintiff's credibility properly; and (iii) relied on flawed VE testimony.  (*See* Mem. of Law in Supp. of Pl.'s Mot. for J. on the Pleadings, Dkt. Entry 14 ("Pl. Mem.").)  The Commissioner opposed Plaintiff's motion and moved for judgment on the pleadings, seeking affirmance of the Commissioner's determination.  (*See* Mem. of Law in Supp. of Def.'s Mot. for J. on the Pleadings, Dkt. Entry 12; Reply Mem. of Law in Further Supp. of Def.'s Mot. for J. on the Pleadings and in Opp. to Pl.'s Cross-mot., Dkt. Entry 15 ("Comm'r Reply").)

### A.    Treating Physician Rule and Failure to Develop a Full Record

With respect to "the nature and severity of [a claimant's] impairment(s)," 20 C.F.R. § 404.1527(d)(2), "[t]he SSA recognizes a 'treating physician' rule of deference to the views of the physician who has engaged in the primary treatment of the claimant."  *Green-Younger v. Barnhart*, 335 F. 3d 99, 106 (2d. Cir. 2003).  A claimant's treating physician is one "who has provided the individual with medical treatment or evaluation and who has or had an ongoing treatment and physician-patient relationship with the individual."  *Schisler v. Bowen,* 851 F. 2d 43, 46 (2d Cir. 1988).  A treating physician's medical opinion regarding the nature and severity of a claimant's impairment is given controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with other substantial evidence in the record."  *Burgess v.* Astrue, 537 F. 3d 117, 128 (2d Cir. 2008)

(quotation marks and alteration omitted). The Second Circuit has noted that "[w]hile the opinions of a treating physician deserve special respect . . . they need not be given controlling weight where they are contradicted by other substantial evidence in the record." *Lazore v. Astrue*, 443 F. App'x. 650, 652 (2d Cir. 2011) (quoting *Veino v. Barnhart,* 312 F. 3d 578, 588 (2d Cir. 2002)). Where a treating source's opinion is not given controlling weight, the proper weight accorded by the ALJ depends upon several factors, including: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist." *Clark v. Comm'r of Social Security,* 143 F. 3d 115, 118 (2d Cir. 1998); *see also* 20 C.F.R. § 404.1527(c)(2).

The ALJ's adherence to the treating physician rule operates in tandem with an affirmative duty to develop a full and fair record. *See Tejada v. Apfel*, 167 F. 3d 770, 774 (2d Cir. 1999); 20 C.F.R. § 404.1512(d)-(f) (setting forth the affirmative obligations of ALJs); *see also supra* § I. In particular, where the plaintiff is proceeding *pro se*, the ALJ must "probe into, inquire of, and explore for all the relevant facts . . . ." *Hankerson v. Harris*, 636 F. 2d 893, 895 (2d Cir. 1980); *see also Cutler v. Weinberger*, 516 F. 2d 1282, 1286 (2d Cir. 1975).

### 1. Failure to Accord Proper Weight to Medical Evidence

Plaintiff contends that the ALJ failed to accord the proper weight to treating physicians, Drs. Lippman and Chen. (*See* Pl. Mem. 14-21.) Plaintiff further argues that the ALJ erroneously ignored the opinion of Ms. Rampersad, who was the physician's assistant to Plaintiff's treating neurologist, Dr. Steiner. (*See id.* 15-17.) The Commissioner responds that the ALJ took the opinions of all three into account and accorded them the proper weight. (*See* Comm'r Reply 2-6.)

In a questionnaire dated June 29, 2009, Dr. Lippman, Plaintiff's treating psychiatrist, opined that Plaintiff could only tolerate low levels of work stress because her MS exacerbates her depressive symptoms, and, as a result, concluded that Plaintiff is likely to be absent from work more than three times a month. (R. 685-86.) The ALJ discounted Dr. Lippman's medical opinion as "totally speculative," and found her conclusions that Plaintiff's memory and concentration were "markedly limited" were undermined by Dr. Lippman's December 17, 2008 report, which concluded, *inter alia*, that Plaintiff had normal coordination. (*Id.* 21.) Assuming, *arguendo*, that this analysis satisfies the ALJ's obligation to evaluate the evidence in support of the opinion and the opinion's consistency with the record, the analysis is still incomplete. The ALJ failed to consider the other factors she must take into account pursuant to 20 C.F.R. § 404.1527(c), *i.e.*, the frequency and length of the treatment relationship and whether the opinion was from a specialist, when determining the weight to give a treating physician. *See Clark*, 143 F. 3d at 118. The ALJ was obligated to consider all of the relevant factors, and because she did not do so, the case must be remanded so the ALJ can reconsider the appropriate weight to give Dr. Lippman's opinion. *See Pimenta v. Barnhart*, 2006 WL 2356145, at *5 (S.D.N.Y. Aug. 14, 2006) (remand appropriate where "the ALJ did not discuss [the treating physician's] qualifications, or the length, frequency, nature, and extent of his relationship with the plaintiff").

Notably, "an ALJ perceives inconsistencies in a treating physician's report, the ALJ bears an affirmative duty to seek out more information from the treating physician and to develop the administrative record accordingly." *Toribio v. Astrue*, 2009 WL 2366766, at *10 (E.D.N.Y. July 31, 2009) (quoting *Hartnett v. Apfel*, 21 F. Supp. 2d 217, 221 (E.D.N.Y. 1998)); *see also* 20 C.F.R § 404.1512(d)(1) (requiring the ALJ to develop Plaintiff's complete medical history). The ALJ stated that she subpoenaed Dr. Lippman's records (*see* R. 21), but it appears that she never

asked for any clarification as to the purported inconsistency between Dr. Lippman's June 29, 2009 report and her December 17, 2008 report.  Seeking such clarification would have been particularly appropriate in this instance where Plaintiff was proceeding *pro se* and there was a six-month gap between the two reports, during which Plaintiff's condition may have worsened.

In addition, the ALJ failed to explain what weight, if any, she gave Plaintiff's primary care physician, Dr. Chen.  Dr. Chen submitted a letter dated August 7, 2008, stating that Plaintiff was unable to work until her neurologists and psychiatrists are able to get her seizures and depression under control.  (R. 511.)  The ALJ completely ignored this opinion and never specified the weight it should be given.  As a medically acceptable source and Plaintiff's treating physician, the ALJ was obligated to explain whether she was giving Dr. Chen's opinion controlling weight and, if not, whether she was giving it any weight at all.  On remand, the ALJ must properly consider Dr. Chen's opinions.

The Commissioner asserts that Dr. Chen's opinion could not form a basis for finding that Plaintiff is disabled because he wrote his opinion before Plaintiff began taking Avonex, which other evidence in the record indicates ameliorated her seizures.  (*See* Comm'r Reply 4.) However, the Commissioner overlooks that Dr. Chen also found that Plaintiff could not work because of her uncontrolled depression and, in any event, there is nothing in the record showing that the ALJ discounted Dr. Chen's opinion for the reason set forth by the Commissioner in his memorandum of law.  If the ALJ did in fact discount Dr. Chen's opinion for the *post hoc* reasons offered by the Commissioner, the ALJ should have said so on the record as part of a review of the relevant factors.

Finally, the ALJ erred by giving "no weight" to Ms. Rampersad's letter, dated February 9, 2009, which stated that Plaintiff "will be unable to work until further notice."  (R. 21, 699.)

The ALJ gave two reasons for not giving any weight to Ms. Rampersad's opinion, neither of which is satisfactory. First, the ALJ concluded that Ms. Rampersad "is treating physician's assistant and not an acceptable medical source." (*Id.* 21.) However, as Plaintiff correctly asserts and the Commissioner does not dispute, simply because a physician's assistant is not an "acceptable medical source" and cannot be given controlling weight under the applicable regulations, *see* 20 C.F.R. §§ 404.1527(a)(2), 416.927(d)(2), the ALJ is not entitled to give Ms. Rampersad's opinion "no weight" just because she is a physician's assistant. Such opinions from other sources are "important and should be evaluated on key issues such as impairment severity and functional effects." SSR 06-03p, Titles II and XVI: Considering Opinions and Other Evidence From Sources Who are Not "Acceptable Medical Sources" in Disability Claims, 2006 WL 2329939, at *3 (Aug. 9, 2006). "Accordingly, even if an ALJ is free to conclude that the opinion of 'non acceptable source' . . . is not entitled to any weight, the ALJ must explain that decision." *Hernandez v. Astrue*, 814 F. Supp. 2d 168, 183 (E.D.N.Y. 2011) (quotation marks and alterations omitted).

The ALJ also found that Ms. Rampersad's opinion was entitled to no weight because Ms. Rampersad only determined that Plaintiff could not work due to the anticipated future side effects of her MS medication, and not any current disability. (R. 21.) However, while the letter mentions anticipated side effects, it also opines that Plaintiff "will be unable to work until further notice due to her *ongoing* condition." (*Id.* 699 (emphasis added).) This reference to her "ongoing condition" appears to describe Plaintiff's MS, not simply future side effects from her medication.[5]

Accordingly, because the ALJ failed to weigh the opinions of Dr. Lippman, Dr. Chen and

---

[5] At a minimum, the statement is ambiguous and, as discussed further *infra* § IV.A.2, it required the ALJ to request clarification from Ms. Rampersad.

Ms. Rampersad in accordance with the applicable regulations, remand is appropriate.

### 2. Duty to Develop the Record

Plaintiff contends that the ALJ failed to develop the record by not requesting opinions from Dr. Steiner, Plaintiff's treating neurologist, and/or Ms. Rampersad, Dr. Steiner's physician's assistant, who also treated Plaintiff. (*See* Pl. Mem. 18.) Plaintiff faults the ALJ for purportedly relying upon her own lay opinion of Dr. Steiner's and Ms. Rampersad's records rather than requesting an opinion. (*Id.* 18-19.) The Commissioner asserts that the record was fully developed and the ALJ properly considered notes from Plaintiff's visits to Dr. Steiner and Ms. Rampersad, including findings they made following a July 16, 2009 examination that Plaintiff's extremities showed no clubbing, she had 5/5 strength in Plaintiff's upper and lower extremities, her coordination finger to nose bilaterally was normal and she was able to ambulate independently. (Comm'r Reply 3-4; R. 693.)

As another court in this district explained,

> [w]hat is valuable about the perspective of the treating physician – what distinguishes him from the examining physician and from the ALJ – is his opportunity to develop an informed *opinion* as to the physical status of a patient. To obtain from a treating physician nothing more than charts and laboratory test results is to undermine the distinctive quality of the treating physician that makes his evidence so much more reliable than that of an examining physician who sees the claimant once and who performs the same tests and studies as the treating physician. It is the *opinion* of the treating physician that is to be sought; it is his *opinion* as to the existence and severity of a disability that is to be given deference. Thus, when the claimant appears pro se, the combined force of the treating physician rule and of the duty to conduct a searching review requires that the ALJ make every reasonable effort to obtain not merely the medical records of the treating physician but also a report that sets forth the opinion of that treating physician as to the existence, the nature, and the severity of the claimed disability.

*Peed v. Sullivan*, 778 F. Supp. 1241, 1246 (E.D.N.Y. 1991). In sum, where a Plaintiff is proceeding *pro se*, "the ALJ must obtain the treating physician's opinion regarding the claimant's alleged disability; 'raw data' or even complete medical records are insufficient by

themselves to fulfill the ALJ's duty." *Dimitriadis v. Barnhart*, 2004 WL 540493, at *9 (S.D.N.Y. Mar. 17, 2004).

Here, the ALJ did not develop the record adequately. Contrary to the Commissioner's assertion, the ALJ's brief mention of notes made by Dr. Steiner is not a proper substitute for his opinion as to the existence, nature and severity of Plaintiff's claimed disability. (*See* R. 17, 19.) As an initial matter, the ALJ selectively quoted from Dr. Steiner's treatment notes appearing to undermine Plaintiff's claimed disability, while ignoring other more negative notes by Dr. Steiner that call out for further inquiry. *See Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 289 (E.D.N.Y. 2004) ("It is not proper for the ALJ to simply pick and choose from the transcript only such evidence that supports his determination, without affording consideration to evidence supporting the plaintiff's claims."). For example, Dr. Steiner's notes from his examination of Plaintiff on July 16, 2009, reported Plaintiff's worsening MS symptoms, including weakness and numbness, and concluded that Plaintiff's "neurological condition has shown worsening depression/anxiety." (R. 693-94.) The ALJ ignored these findings that potentially supported Plaintiff's disability claims, while selectively quoting from the other portions of Dr. Steiner's July 16, 2009 notes that tend to support the ALJ's decision.

More fundamentally, the ALJ should not have relied only upon the "raw data" and notes of Dr. Steiner without Dr. Steiner's opinion on whether Plaintiff could satisfy employment requirements. While the ALJ is permitted to rely upon Dr. Steiner's notes in determining whether the doctor's medical opinions, or other medical opinions, are properly supported, the ALJ should not have used these materials in a vacuum, without Dr. Steiner's opinion, particularly in light of Plaintiff's *pro se* status.

Accordingly, because the record was not fully and adequately developed, this action must be remanded so the ALJ can solicit the opinion of Dr. Steiner and properly weigh that opinion.

### B.    Plaintiff's Credibility

Plaintiff also asserts that the ALJ did not evaluate Plaintiff's credibility properly.  (*See* Pl. Mem. 21-23.)  Plaintiff contends that the ALJ found that Plaintiff's testimony was inconsistent with other statements she had made based upon statements that were not really contradictory, and the ALJ failed to consider all of the credibility factors mandated by 20 C.F.R. 404.1529. (*See id.* 22-23.)   The Commissioner responds that the ALJ carefully considered Plaintiff's credibility and appropriately found that her testimony was inconsistent, and considered all the factors in 20 C.F.R. 404.1529.  (*See* Comm'r Reply 6-7.)

The Second Circuit recognizes that subjective allegations of pain may serve as a basis for establishing disability.  *Taylor v. Barnhart,* 83 F. App'x 347, 350 (2d Cir. 2010).  However, the ALJ is afforded the discretion to assess the credibility of a claimant and is not "required to credit [plaintiff's] testimony about the severity of her pain and the functional limitations it caused." *Correale-Englehart v. Astrue*, 687 F. Supp. 2d 396, 434 (S.D.N.Y. 2010) (quoting *Rivers v. Astrue*, 280 F. App'x. 20, 22 (2d Cir. 2008)).  In determining Plaintiff's credibility, the ALJ must adhere to a two-step inquiry set forth by the regulations.  *See Peck v. Astrue*, 2010 WL 3125950, at *4 (E.D.N.Y. Aug. 6, 2010).  First, the ALJ must consider whether there is a medically determinable impairment that could reasonably be expected to produce the pain or symptoms alleged.  20 C.F.R. § 404.1529(b); S.S.R. 96-7p.  Second, if the ALJ finds that the individual suffers from a medically determinable impairment that could reasonably be expected to produce the pain or symptoms alleged, then the ALJ is to evaluate the intensity, persistence, and limiting

effects of the individual's symptoms to determine the extent to which they limit the individual's ability to work. 20 C.F.R. § 404.1529(c)(1); S.S.R. 96-7p.

Where the ALJ finds that the claimant's testimony is not consistent with the objective medical evidence, the ALJ is to evaluate the claimant's testimony in light of seven factors: 1) the claimant's daily activities; 2) the location, duration, frequency, and intensity of the pain; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain; 5) any treatment, other than medication, that the claimant has received; 6) any other measures that the claimant employs to relieve the pain; and 7) other factors concerning the claimant's functional limitations and restrictions as a result of the pain. 20 C.F.R. § 404.1529(c)(3)(i)-(vii).

"If the ALJ rejects plaintiff's testimony after considering the objective medical evidence and any other factors deemed relevant, he must explain that decision with sufficient specificity to permit a reviewing court to decide whether there are legitimate reasons for the ALJ's disbelief." *Correale-Englehart,* 687 F. Supp. 2d at 435. Where the ALJ neglects to discuss at length her credibility determination to the extent the reviewing court cannot decide whether there are legitimate reasons for the ALJ's disbelief and whether her decision is supported by substantial evidence, remand is appropriate. *Id.* at 435-36; *see also Grosse v. Comm'r of Soc. Sec.*, 2011 WL 128565, at *5 (E.D.N.Y. Jan. 14, 2011) (finding that the ALJ committed legal error by failing to apply factors two through seven); *Valet v. Astrue*, 2012 WL 194970, at *22 (E.D.N.Y. Jan. 23, 2012) (remanding because the ALJ failed to address all seven factors).

The ALJ determined that Plaintiff indeed suffers from a medically determinable impairment that could reasonably be expected to produce some of her alleged symptoms, but rejected Plaintiff's testimony at step two of the analysis on the basis that it was inconsistent with

the residual functional capacity assessment, due to the lack of supporting medical evidence reflecting the "intensity, persistence, and limiting effects" of her claimed symptoms. (R. 19.) More specifically, at her hearing, Plaintiff reported that she was unable to walk for more than half a block without stopping, stand for more than one or two minutes without leaning on something, or sit for longer than 30 to 40 minutes without standing up due to back pain, stiffness, and pain and tingling in the legs. (*Id.* 67-69.) Plaintiff reported tingling and numbness in her fingers resulting in difficulty reaching overhead and grasping items, such as hair barrettes, with her fingers. (*Id.* 69-70.) She also reported an inability to lift more than five or six pounds, and stated that simply holding a gallon of milk is difficult. (*Id.* 71.)

In determining that she was not credible, the ALJ found that Plaintiff's prior statements in her function report and to treating physicians were inconsistent, as was her earlier testimony at the hearing. (*Id.* 20.) The ALJ came to this conclusion because Plaintiff testified that she paces when she is unable to sleep, but is able to stand for one or two minutes and walk for only a half a block before needing to sit. (*Id.*) The court notes that there is no clear inconsistency between these two statements, and that the ALJ failed to inquire about the extent of Plaintiff's pacing in order to determine if there was a real inconsistency.

Moreover, "the Second Circuit has held that an individual who engages in activities of daily living, especially when these activities are not engaged in 'for sustained periods comparable to those required to hold a sedentary job,' may still be found to be disabled." *Kaplan v. Barnhart*, 2004 WL 528440, at *3 (E.D.N.Y. Feb. 24, 2004) (quoting *Balsamo v. Chater*, 142 F. 3d 75, 81 (2d Cir. 1998)). The ALJ failed to explain how Plaintiff's pacing when she was unable to sleep leads to the conclusion that she can hold down a job.

Finally, in assessing Plaintiff's credibility as to the extent of her pain, the ALJ failed to account for the known side effects from her Avonex injections. The ALJ is required to take into account medication side effects pursuant to 20 C.F.R. 404.1529(c)(3)(iv) in making her credibility determination.

Accordingly, the court remands this action so the ALJ can re-evaluate Plaintiff's credibility.

### C.      Vocational Expert Testimony

Plaintiff contends that the ALJ presented hypothetical claimants to the VE on the basis of an improperly formulated RFC because the hypothetical was based upon her flawed evaluation of the record. (*See* Pl. Mem. 23-24.) The Commissioner asserts that the hypothetical was supported by Plaintiff's testimony and the aggregate medical record, and, therefore, the ALJ was correct in finding that Plaintiff was capable of performing certain jobs, such as light cleaner, street cleaner, and small product assembler. (*See* Comm'r Mem. 8-9.)

To determine a claimant's RFC, the ALJ "must consider objective medical facts, diagnoses and medical opinions based on such facts, and subjective evidence of pain or disability testified to by the claimant or others." *Pluck v. Astrue*, 2011 WL 917654, at *22 (E.D.N.Y. Mar. 9, 2011) (quoting *Ferraris v. Heckler*, 728 F. 2d 582, 585 (2d Cir. 1984)). An ALJ is permitted to rely on a vocational expert's testimony regarding a hypothetical provided that the facts of the hypothetical are based on substantial evidence, and accurately reflect the limitations and capabilities of the claimant. *See Dumas v. Schweiker,* 712 F. 2d 1545, 1553-54 (2d Cir. 1983).

Based upon the VE's testimony, the ALJ found that Plaintiff was incapable of performing her past work as a gas station assistant manager, but could handle certain unskilled and light exertional jobs. (R. 21-23.) The VE's testimony was based upon the ALJ's hypothetical that

Plaintiff can, among other things, follow simple directions, maintain a regular schedule, concentrate for extended periods and adapt to changes in the environment. (*Id.* 77-79.) It appears from the record that the ALJ conjured up this hypothetical based upon her decision not to credit Plaintiff's testimony and the opinions of Dr. Lippman, Dr. Chen and Ms. Rampersad, all of whom submitted evidence that contradicted the hypothetical. As discussed *supra* § IV.A-B, the ALJ failed to properly evaluate and weigh these sources and/or obtain adequate information from these sources. Therefore, on this record, the court cannot determine whether the hypothetical was appropriate, much less whether the VE's testimony based on the hypothetical can be credited accordingly. On remand, the ALJ must reconsider her hypothetical based upon her reweighing of Plaintiff's testimony and the medical evidence and her further developing the record in accordance with this Order. A VE should then testify on remand based upon the ALJ's new RFC and hypothetical.

**CONCLUSION**

For the foregoing reasons, the Commissioner's motion is denied and Plaintiff's motion for judgment on the pleadings is granted. Accordingly, the Commissioner's decision is reversed and remanded to the Commissioner pursuant to the fourth and sixth sentences of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this opinion. Specifically, on remand, the ALJ is to: (i) fully develop the administrative record by obtaining opinions from Plaintiff's treating physicians; (ii) set forth the weight she is giving to Plaintiff's treating physicians and physician's assistant after considering all of the relevant factors; (iii) re-weigh Plaintiff's credibility; and (iv) obtain new VE testimony based upon the further development of the record and reassessment of the evidence.

SO ORDERED

DATED:      Brooklyn, New York
              August 29, 2012


_____/s/_____
DORA L. IRIZARRY
United States District Judge